Gary D. SWANK, Plaintiff–Appellant,

v.

James SMART, et al.,
Defendants–Appellees.

No. 89–1360.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 2, 1989.

Decided March 27, 1990.

Rehearing Denied April 27, 1990.

John H. Bisbee, Macomb, Ill., for plaintiff-appellant.

Mary W. McDade, Murvel Pretorius, Jr., Quinn, Johnston, Henderson & Pretorius, Stephen D. Gay, Husch, Eppenberger, Donohue, Cornfeld & Jenkins, Peoria, Ill., for defendants-appellees.

Before CUDAHY, POSNER, and MANION, Circuit Judges.

POSNER, Circuit Judge.

A policeman brought this civil rights suit against a small town in western Illinois that fired him for conduct unbecoming an officer, and against the officials actually responsible for the firing. 42 U.S.C. § 1983. The district judge granted summary judgment on his own initiative and dismissed the case.

Tina Millin was a 17–year–old student at the Robert Morris College in Carthage. Gary Swank was a member of the town's three-man police force. On September 24, 1986, after supping at McDonald's with his wife, Swank, who was off duty, mounted his motorcycle and rode off to look for a friend who worked the night shift in the sheriff's office. He could not find him and rode around looking. His quest took him several times through an intersection where two teenage girls, whom he did not know, waved at him. On his fourth pass through the intersection Swank stopped, flagged down by one of the girls. This was Tina, who was attracted by the "cute little elephant on his bike," and whose former boyfriend had taken her for rides on *his* motorcycle. After chatting with the two girls for a while, Swank took Tina for a ride on his motorcycle. The ride, which began sometime between 12:30 and 1:30 a.m., lasted twenty or thirty minutes. The riders discussed Tina's courses at the college, the motorcycle, her former boyfriend, her opinion of Carthage, and similar topics. At the end of the ride, Swank deposited Tina at the intersection where he had found

her and where the other girl was still waiting.

Another Carthage policeman saw Swank and Tina Millin riding on the motorcycle and he reported what he had seen to the chief of police. Swank was already on probation with the department for various deficiencies in the performance of his duties. To his chief, the late-night ride with a teenage girl—who turned out to be a student of the college—was the last straw. The chief prepared a list of charges to present to the Public Safety Committee of the City Council at its meeting on the evening of October 6. At 2:00 a.m. on the day of the meeting, he obtained a statement from Tina concerning the ride. He mentioned the statement to the members of the committee, but they didn't want to read it because, in the words of the mayor, who was the committee's chairman, "they didn't want to know all the gory details."

The list of charges, which the chief read aloud at the meeting, recounted the motorcycle incident and added that Swank had lied when confronted with it. Swank, who was present by invitation, was asked to respond to the charges, and he did. He denied that he had lied to the chief about the incident but admitted that the incident had occurred. He emphatically denied any romantic or sexual angle. After Swank had responded to the charges, the chief gave the committee members a brief written statement that the chief had prepared. It stated that the Carthage police had to have the complete confidence of the college and its students and that the motorcycle ride had "tarnished" the police force's (collective) badge.

The chief and Swank were then excused, and the committee deliberated. At the conclusion of its deliberations, it voted to suspend Swank until the next meeting of the City Council, which took place on October 14. Swank was not present at that meeting. The chairman of the Public Safety Committee (the mayor) presented the matter to the council, noted the police chief's belief that Swank had exhibited "conduct unbecoming a police officer," and finished by telling the council that the committee recommended that Swank be fired. The council then voted four to three to fire him, on the ground that the motorcycle incident "was his third write up [and] the incident [was] damaging the good relationship the city police and the city had with the college students and personnel." The complaint in this lawsuit alleges that the defendants revealed to the local press the ground for firing Swank. The firing received some coverage in local newspapers, and one of the articles mentioned that the ground was conduct unbecoming an officer. Since being fired, Swank has been unable to obtain another job as a policeman. And the Robert Morris College has closed its Carthage campus.

Swank contends that his dismissal from the Carthage police force deprived him of his constitutional rights to freedom of speech, freedom of locomotion, and freedom of association, and also deprived him of his property right and liberty interest in his job (for, despite being "on probation," he was a tenured rather than probationary civil servant when fired) without due process of law. The appeal emphasizes, mistakenly as it seems to us, the deprivation of Swank's substantive rights—aspects of liberty that, he contends, the due process clause of the Fourteenth Amendment secures to him unless the state can demonstrate an overriding public purpose in restricting them—rather than his right not to be deprived of his job without minimum procedural safeguards.

■ The free-speech claim is quickly dispatched. The conversation between Swank and Tina on the motorcycle was speech in the literal sense, but not speech protected by the free-speech clause of the First Amendment (made applicable to the states and their subdivisions via the Fourteenth Amendment by *Gitlow v. New York*, 268 U.S. 652, 666, 45 S.Ct. 625, 629, 69 L.Ed. 1138 (1925)). It was also association in the literal sense, but not association "for the advancement of beliefs and ideas." *NAACP v. Alabama*, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). The purpose of the free-speech clause and of its judge-made corollary the right of

association is to protect the market in ideas, *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting), broadly understood as the public expression of ideas, narratives, concepts, imagery, opinions—scientific, political, or aesthetic—to an audience whom the speaker seeks to inform, edify, or entertain. Casual chit-chat between two persons or otherwise confined to a small social group is unrelated, or largely so, to that marketplace, and is not protected. Such conversation is important to its participants but not to the advancement of knowledge, the transformation of taste, political change, cultural expression, and the other objectives, values, and consequences of the speech that is protected by the First Amendment.

■ The distinction is sharply—perhaps too sharply—drawn in cases in which public employees are fired because of something they said. They have no First Amendment claim unless they were speaking on matters of "public concern." *Connick v. Myers*, 461 U.S. 138, 142–49, 103 S.Ct. 1684, 1687–91, 75 L.Ed.2d 708 (1983); *Biggs v. Village of Dupo*, 892 F.2d 1298, 1301–03 (7th Cir.1990). Maybe, as the Tenth Circuit suggested in *Flanagan v. Munger*, 890 F.2d 1557, 1563–65 (1989), the purpose of the "public concern" requirement is to distinguish grievances of an entirely personal character from statements of broader interest concerning one's job, rather than to fix the boundaries of the First Amendment. That refinement is not important in this case. Whatever the exact boundaries, constitutionally protected expression is not the totality of expression. That "kernel of expression" which can be found "in almost every activity a person undertakes—for example, walking down the street, or meeting one's friends at a shopping mall ... is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin*, — U.S. ——, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989).

Discussion of college courses, of college itself, of Carthage (whether that "cauldron of unholy loves" of which St. Augustine speaks in the *Confessions*, or its Illinois namesake, where Joseph Smith, the founder of the Mormon religion, was lynched)—even discussion of motorcycles and former boyfriends—can contribute to the marketplace of ideas. But not in this case. The conversation that took place between Gary Swank and Tina Millin on the motorcycle ride, a conversation idle or flirtatious in character, was too remote from the political rally, the press conference, the demonstration, the theater, or other familiar emporia of the marketplace of ideas to activate the guarantees of the First Amendment.

■ Yet because chit-chat is important to the participants, although not to the community when conceived of as more than the sum of its members, the freedom to engage in it is an aspect of the liberty protected by the due process clause, along with the freedom to exercise other harmless liberties illustrated by *Ellwest Stereo Theatres, Inc. v. Wenner*, 681 F.2d 1243, 1247 (9th Cir.1982). A law that enjoined silence on all persons not participating in the marketplace of ideas, a law that forbade people to go from one place to another within the same state (and so extinguished the "right of locomotion," as distinct from the right to travel interstate, *Williams v. Fears*, 179 U.S. 270, 274, 21 S.Ct. 128, 129, 45 L.Ed. 186 (1900)), a law that forbade dating or, for that matter, forbade an off-duty policeman to offer a ride on his motorcycle to a coed—all of these hypothetical laws would infringe liberty. If arbitrary, they would be deemed to violate "substantive due process," the term for the protection that the due process clause has been held to extend to substantive rights not listed in the Bill of Rights. Some of these nonenumerated substantive liberties receive broader protection (broader, that is, than protection merely against *arbitrary* deprivations) under such rubrics as "right of privacy," "fundamental right," and "right of association" in a nonexpressive sense. *Roberts v. United States Jaycees*, 468 U.S. 609, 617–20, 104 S.Ct. 3244, 3249–51, 82 L.Ed.2d 462 (1984). And sometimes these "fundamental rights" pop up in the employment setting, cf. *Shondel v. McDermott*, 775 F.2d

859, 865–66 (7th Cir.1985), and when they do it is sometimes suggested—erroneously, in light of *Roberts* and *Stanglin* —that the First Amendment protects nonexpressive associations. The principal case is *Wilson v. Taylor*, 733 F.2d 1539, 1542–44 (11th Cir.1984), which concerns a policeman's dating a felon's daughter. *Wilson* was decided three weeks before *Roberts*, and did not survive it. *IDK, Inc. v. Clark County*, 836 F.2d 1185, 1192–96 (9th Cir.1988); *Fleisher v. City of Signal Hill*, 829 F.2d 1491, 1500 (9th Cir.1987).

■ No more than the First Amendment are any fundamental rights involved in this case. Swank himself is for obvious reasons emphatic that his encounter with Tina, like the encounters with strangers in a dance hall in *Stanglin*, was not an intimate association—the kind of association to which a specially protected constitutional right of privacy might attach. Instead it is sorted to the residual bin, what we are calling the "harmless liberties," the liberties that are protected only against *arbitrary* infringements.

The limitation is vital. The concept of "ordered liberty" (*Palko v. Connecticut*, 302 U.S. 319, 324–25, 58 S.Ct. 149, 151–52, 82 L.Ed. 288 (1937) (Cardozo, J.); *Adamson v. California*, 332 U.S. 46, 67, 67 S.Ct. 1672, 1683, 91 L.Ed. 1903 (1947) (Frankfurter, J., concurring)) that many judges have found implicit in the due process clause may forbid arbitrary restrictions on personal liberty, broadly defined, but federal courts cannot undertake in the name of the Constitution to regulate minutely every restriction that public employers place on their employees. *Bishop v. Wood*, 426 U.S. 341, 349–50, 96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684 (1976); *Patterson v. Portch*, 853 F.2d 1399, 1405 (7th Cir.1988). The Constitution is not an employment manual. True, it has been interpreted to confer *procedural* protection on *tenured* employees; but if Swank's submission is correct, it also confers a broad range of ill-defined *substantive* rights, and confers them irrespective of tenure. If his submission is correct Carthage could no more discipline an at-will employee for flexing his liberties of locomotion, association, and social conversation in the manner in which Swank flexed these liberties when he gave Tina a ride than it could discipline a tenured employee such as Swank himself. Tenure is relevant to Swank's "procedural due process" claim—that he was deprived of his tenured position without adequate procedural safeguards against erroneous deprivation—but not to his substantive due process claims.

A restriction on a form of liberty not explicitly codified in the Bill of Rights or singled out by the courts for special protection under such rubrics as "right to privacy" and "fundamental rights" violates the due process clause only if utterly unreasonable—that is what "arbitrary" means in this setting—and it is less likely to be found so if it is a regulation of public employees than if it is a regulation of private citizens. *Kelley v. Johnson*, 425 U.S. 238, 248–49, 96 S.Ct. 1440, 1446–47, 47 L.Ed.2d 708 (1976). The police can prohibit its officers from wearing their hair long. *Id.* at 247–48, 96 S.Ct. at 1445–46; *Shawgo v. Spradlin*, 701 F.2d 470, 483 (5th Cir. 1983). We expect it could not prohibit private persons from wearing their hair long unless they were prisoners, *Reed v. Faulkner*, 842 F.2d 960, 962 (7th Cir.1988), or some other exceptional circumstance were shown.

■ Sometimes public employers go too far, and are held to deny their employees substantive due process: our favorite example is the school bus driver fired for wearing a mustache. *Pence v. Rosenquist*, 573 F.2d 395 (7th Cir.1978). The freedom to grow or shave a mustache is not the loftiest component of personal liberty, but unless substantive due process is discarded as a constitutional doctrine, infringements of that freedom will not be allowed unless there is some attempt at justification. Closer to the present case, however, are cases in which the firing of a public employee suspected of departing from a code of sexual propriety no longer widely observed in this country has been held to deny the employee substantive due process. But these cases are based on the right of privacy, as in *Thorne v. City of El Segundo*, 726 F.2d 459, 468–71 (9th Cir.1983), and

have been interpreted narrowly. *Fleisher v. City of Signal Hill, supra; Fugate v. Phoenix Civil Service Bd.,* 791 F.2d 736 (9th Cir.1986).

This is not a right of privacy case. It is not a freedom of speech case. In other words it is a case neither about freedom of intimate association nor about freedom of expressive association. The legal test therefore is sheer unreasonableness and we cannot say that Carthage's decision to regard *l'affaire* Tina as conduct unbecoming a police officer flunks it. The college authorities and the students' parents deprecate intrigues between students and married police officers, and while Swank's brief relationship with Tina Millin was not that, the appearance of impropriety was there—in a married man's giving a teenage girl whom he had never met before a motorcycle ride late at night—and the judgment displayed by Swank poor. Or so at least the town could conclude without taking such leave of its senses as would convict it of a denial of substantive due process. The defendants may have overreacted by firing Swank for an incident that seems trivial by itself; but remember that it was his third strike, so it is no surprise that he was called out. The action of the police in picking up Tina at 2:00 a.m. to get her statement could of course be thought to bespeak an insensitivity no less than Swank's to appearances of impropriety. But Swank's counsel failed to develop the facts bearing on the incident.

■ So much for substantive rights. As a tenured employee Swank had certain procedural rights that he claims the defendants also infringed. He will not be heard to argue that he was denied fair notice because the regulations governing the conduct of Carthage police officers failed to specify late-night off-duty motorcycle rides for college students of the opposite sex as grounds for discharge. The duty of fair notice does not require such extraordinary and particularized foresight of the specific manner in which an officer might display poor judgment meriting severe discipline. Vague, catch-all standards for discipline do not violate due process. *Brasslett v. Cota,*

761 F.2d 827, 838 (1st Cir.1985). But Swank was entitled to notice of the charges against him and an opportunity to answer them.

■ He was given an opportunity to answer the formal charges that the police chief read to the Public Safety Committee, but no opportunity to respond to the written statement that the chief submitted to the committee just before he and Swank were excused, evaluating the effect of Swank's conduct on the police department and on the town. If that statement were properly characterized as a list of additional charges, Swank would clearly have been denied due process. It is not that. The statement did not charge Swank with any misconduct not encompassed by the seven charges that the police chief read aloud. It was the chief's assessment of the harm that the misconduct had caused. It was evidence rather than pleading—but it was relevant, and indeed highly material, evidence. So while there is no problem of insufficient notice of the charges, there is a serious problem of the adequacy of the hearing. The harm caused by the Tina incident apparently influenced the committee's decision on how severe a sanction to impose on Swank, for in justifying its decision to fire Swank rather than impose some lesser sanction the committee mentioned the threat posed by the motorcycle incident to the police department's relations with the college—the police chief's point exactly.

Suppose Swank had been charged with firing his gun without good cause, and had been allowed to answer the charge; and when he had finished answering, the chief told the committee "and by the way the president of Robert Morris College was killed." This would be a material aspect of the charge and Swank would be entitled to challenge it. Similarly we think he was entitled to challenge the chief's assessment of the damage caused by the Tina incident. Ex parte presentation of evidence denies due process, *Greene v. McElroy,* 360 U.S. 474, 496–97, 79 S.Ct. 1400, 1413–14, 3 L.Ed.2d 1377 (1959), with exceptions—for example, in some prison-discipline cases, *McCollum v. Miller,* 695 F.2d 1044, 1049

(7th Cir.1982), and in other limited settings where evidence is introduced *in camera,* *Jay v. Boyd,* 351 U.S. 345, 76 S.Ct. 919, 100 L.Ed. 1242 (1956)—that are not pertinent to this case.

An alternative characterization may seem possible: that the chief was offering not evidence but argument. That would be a proper characterization if he had been commenting on town-gown relations in general. But he was commenting on relations between the college and the police department in particular. He was offering in effect an expert's opinion, and that is evidence which Swank was entitled to an opportunity to rebut. The chief himself, in his deposition, described the statement (by which we mean the part that was not shown Swank) as "reflect[ing] my opinion that [Swank] has done damage to our professional image." The brief for the individual defendants (including the chief) describes the statement similarly, as "Smart's conclusion as to the effect" of the alleged misconduct. The district judge construed it the same way. Most important, the City Council based its conclusion that there was just cause to fire Swank in part on "the [Tina] incident damaging the good relationship the City Police and City had with the college students and college personnel." This finding was based in turn on the chief's statement.

In any event, while not even a criminal defendant has a constitutional right to argue last, a prosecutor (as—to continue the criminal analogy—the police chief was in this disciplinary matter) is no more entitled to make ex parte arguments to the tribunal than to present ex parte evidence or to press charges of which the accused has no notice. In the argument to this court, for example, Swank's counsel addressed the court last, in his rebuttal argument; it would have been an extraordinary impropriety if he had delivered his rebuttal argument to us in the privacy of our chambers with the defendants' counsel not present.

The failure to show Tina's statement to Swank and allow him to comment on it was a separate infringement of his right to a fair hearing even though—in fact, because—it was not shown to the members of the Public Safety Committee either. The problem is not as it might seem to be that Tina was driven to the police station at 2:00 a.m. to give her statement. Swank does not contend that there was any coercion or other impropriety involved in obtaining Tina's statement; and if there were, so what? Provided the statement was not used against Swank at the hearing, the proper analogy would be to the coercive extraction of a confession not used at the defendant's trial.

Our point, therefore, is not that Swank was denied the opportunity to challenge a statement that was actually introduced into evidence against him. Nor is it even that he was denied the opportunity to use an exculpatory statement. We are not suggesting that due process in employee discharge cases includes a right to prehearing discovery, or that the principle of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which requires the prosecution in a criminal case to provide exculpatory materials in its possession to the defendant upon request, is applicable to employee discharge cases. The point is different. It is that although Tina's statement was not read by the members of the committee, it was *used* by them; effectively it was in evidence.

The committee members had formed the idea that there had been hanky-pank between Swank and Tina and assumed therefore that the statement contained "gory details." As the mayor elaborated, "I just didn't feel like it would have been in good taste for myself or the safety committee to go over it because it's a small town and I am sure somebody would divulge the information." In fact there was no information to divulge, or at least—the critical point—much less than the mayor and the other members of the committee believed. Nothing had happened between Swank and Tina. Well, almost nothing. She had asked him whether he was married, and (according to her statement) "his exact words were 'Who wants to be married.' I thought, 'Oh, O.K.' So I just thought he wasn't and I looked

for a wedding band on his finger and he didn't have one on." When she learned he was married, she was "kinda hurt, I guess. I felt like I had been taken advantage of. I thought he was terrible for doing what he'd done, instead of staying home with his wife." Nevertheless she was emphatic that "no physical stuff, alcohol, or other drugs [had been] involved in the encounter with Gary," that they had not talked about seeing each other again, and that they had not in fact seen each other again. And while she had concluded that Swank was "the 'rotten apple' in the police department," she didn't "blame the whole police department." Swank could have used Tina's statement—a statement that having been extracted by his nemesis, the police chief, would have been more credible than Swank's own statement—to argue not only that his encounter with her had been innocent, but also that it had not tarnished the police department's collective badge: the rotten apple hadn't spoiled the entire barrel.

It is true that the chief never argued to the Committee that there was a sexual or romantic relationship between Swank and Tina. He didn't have to, for apparently the Committee assumed there was. Swank was entitled to an opportunity to still their suspicions by revealing the actual contents of Tina's statement. True, the statement was not entirely favorable to him; the Committee might have picked out the attempt by Swank to conceal his marriage and used it as additional evidence against him. If shown the statement, he might have found it embarrassing and made no use of it at all. But it was potentially critical evidence that he was entitled to see; the withholding of it from him may well have resulted in the Committee's thinking worse of him than the facts justified.

The case would stand differently if the committee had not learned of the statement's existence. For then the statement could not have harmed Swank—could not have been a kind of evidence against him although not actually shown to the committee members. The question would have been whether the chief of police, corresponding to the prosecutor in a civil case,

had a *Brady*esque duty to disclose exculpatory materials to Swank if Swank requested them. We may assume that the answer is no, since the procedural safeguards due a person facing loss of a tenured job are more modest than those due a person facing criminal punishment. But this is not a *Brady* case. The committee knew about Tina's statement and from this knowledge conjectured "gory details" that strengthened the inference that Swank had been (1) guilty of (2) serious misconduct. For it seemed that the chief had proof, and that the proof was dynamite. Without being placed in evidence—indeed, *because* it was not placed in evidence—Tina's statement was the most damaging piece of evidence against Swank. He had a right to see and use it in his defense.

There is an analogy to the principle of the law of fraud that silence can, in some circumstances, mislead. The mayor told the chief that he did not want to see the gory details. The chief could have said, "There are no gory details." He did not. He kept mum. His silence was implicit agreement with the mayor's characterization. It reinforced the mayor's suspicions.

The modest additional procedural safeguards that we believe Swank was entitled to would not have been burdensome for the town of Carthage, small and unlawyered as it is, yet would have contributed substantially to the making of a rational decision affecting a person's livelihood. They were therefore required by the "sliding scale" approach that the Supreme Court has prescribed for evaluating procedural claims. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 261–62, 107 S.Ct. 1740, 1747–48, 95 L.Ed.2d 239 (1987); *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 543–46, 105 S.Ct. 1487, 1493–95, 84 L.Ed.2d 494 (1985); *Sutton v. City of Milwaukee*, 672 F.2d 644 (7th Cir.1982); *Fleury v. Clayton*, 847 F.2d 1229, 1231–32 (7th Cir.1988). Whether constitutionally adequate procedures would have changed the outcome is of course disputable and disputed, but that issue

goes to damages rather than to liability. *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Laje v. R.E. Thomason General Hospital*, 665 F.2d 724, 728–29 (5th Cir.1982).

If there were no dispute about the procedural rights that were offered to Swank, we could grant him summary judgment on liability. There is no dispute about the rights that were offered him at the hearing before the Public Safety Committee. But there is a dispute over whether he was offered a further hearing. The town might well have gotten away with as little procedure as it gave Swank at the hearing before the committee if it had offered him a post-termination hearing. *Powell v. Mikulecky*, 891 F.2d 1454 (10th Cir.1989); *Riggins v. Board of Regents*, 790 F.2d 707 (8th Cir.1986); *Brasslett v. Cota, supra*, 761 F.2d at 832–38. A public agency can fire an employee on the basis of notice (which there was here) and a probable-cause hearing, provided it offers him a full hearing afterward. *Cleveland Bd. of Education v. Loudermill, supra*, 470 U.S. at 545–46, 105 S.Ct. at 1495; *Brock v. Roadway Express, Inc., supra*, 481 U.S. at 261–62, 107 S.Ct. at 1747–48. Only if there is no provision for a post-termination hearing must the pre-termination hearing provide all the procedural safeguards to which due process entitles a tenured public employee. *A fortiori*, a first hearing need not provide a full set of procedural safeguards if there is a chance for a second hearing before termination. Whether there was such a chance or not here is disputed. According to the defendants' depositions, after the initial hearing—the hearing before the Public Safety Committee—Swank asked whether there would be another hearing and the defendants told him that one would be arranged if he wanted but reminded him that he had already had a hearing, in the meeting of the committee—to which Swank replied that he guessed he had and anyway he wasn't going to sue. But according to Swank's deposition, he asked the mayor whether he was entitled to a hearing and was told, "There's your hearing"—referring to the truncated proceeding before the committee. If Swank is

believed, he had no opportunity for a further hearing; if the defendants are believed, he had the right to a further hearing but waived it. This is a genuine issue of material fact; it cannot be resolved on summary judgment.

Before deciding what our disposition of the procedural due process issue should be, however, we must consider whether the individual defendants are immune from liability for the alleged violation of Swank's procedural rights. The test is whether the grounds for liability were clearly established at the time of the violations. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It was as well established in 1986 as it is today that a tenured public employee has a constitutional entitlement to a fair hearing before being fired and that with immaterial exceptions a fair hearing includes the right to be shown the evidence on which the tribunal has relied, *Goss v. Lopez*, 419 U.S. 565, 581, 95 S.Ct. 729, 739, 42 L.Ed.2d 725 (1975); *Morrissey v. Brewer*, 408 U.S. 471, 487–89, 92 S.Ct. 2593, 2603–04, 33 L.Ed.2d 484 (1972); 2 Davis, Administrative Law Treatise § 13:11, at p. 508 (1979), including evidence pertaining to the gravity of the sanction to be imposed when liability is conceded. *Morrissey v. Brewer, supra*, 408 U.S. at 488, 92 S.Ct. at 2603; cf. *In re Grand Jury Proceedings*, 894 F.2d 881, 885 (7th Cir.1990). This specific constituent, at least, of a fair hearing was well established in 1986, as it has to have been for its denial to elude the immunity defense. *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir.1986); *Colaizzi v. Walker*, 812 F.2d 304 (7th Cir.1987). The only possible doubt about the police chief's statement is whether it should be characterized as a pleading, as evidence (which we think is the correct characterization), or as argument; but however it is characterized, the presentation of it in secret to the decision-making tribunal violated a specific procedural entitlement clearly established at the time of the violation. It makes no difference that there has never been a case with facts

identical to this one. *Landstrom v. Illinois Department of Children & Family Services*, 892 F.2d 670, 676–78 (7th Cir. 1990), and cases cited there.

In contrast, our characterization of Tina's statement as evidence rather than undisclosed exculpatory material is a novelty of this opinion. Current immunity doctrine requires clear notice to public officials that their conduct violates the Constitution. The notice can of course be given by decisions interpreting the Constitution, but the interpretations must be specific, not general. No decisions placed these defendants on specific notice that their conduct of the hearing denied Swank his constitutional rights. This conclusion requires the dismissal of so much of the case against the individual defendants as concerns Tina's statement, but leaves Carthage's liability unaffected. It is undisputed that the discharge of Swank occurred at the policy-making level of town government.

Swank's remaining argument is that the ground for his dismissal—conduct unbecoming a police officer—coupled with public dissemination of the ground, has prevented him from obtaining another job as a policeman and by doing so has infringed his liberty of occupation. The argument may seem to add nothing to Swank's case, since he was a tenured employee. Such an employee is entitled to notice and hearing before being fired, whatever the ground on which he is fired. The liberty of occupation cases entitle a nontenured employee to a fair hearing if but only if he was fired on a ground that impairs his ability to obtain comparable work in the future. *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136 (7th Cir.1984). The hearing that is adequate for one is adequate for the other.

Or is it? It could be argued that because a stigmatizing dismissal has graver consequences for the employee than a nonstigmatizing one, a more elaborate procedure should be required. This argument would be consistent with the "sliding scale" approach that the Supreme Court adopted in *Mathews v. Eldridge,* and with common sense. A defendant in a capital case is entitled to more procedure than a defendant in a parking-ticket case. If Swank was fired on a ground likely to exclude him from his occupation, he was exposed to a more severe punishment than if he merely lost a position with one employer. Maybe therefore he was entitled to more procedural safeguards than he received. The point will be academic if it turns out on remand that Swank was denied even those possibly less elaborate procedural rights to which he was entitled as a tenured employee regardless of the ground on which he was dismissed. Actually, it is academic now, because it has never been raised. We add for completeness that the point would not help Swank over the immunity hurdle. The entitlement of a liberty-of-occupation plaintiff to more procedural rights than an ordinary tenured employee has is even more novel than the entitlement of that employee to the procedural safeguards that the defendants omitted in this case. Novel entitlements no longer ground damages liability against individuals charged with constitutional torts. But again the liability of the town would be unaffected.

The liberty of occupation argument is not completely moot, however, because it could affect the amount of damages. Even when a plaintiff succeeds in demonstrating a violation of his procedural rights, he often has difficulty proving more than nominal damages. To get damages that will compensate for the loss of the job itself he must prove that if only he had received his procedural rights he would not have been fired. *Lossman v. Pekarske,* 707 F.2d 288, 290–91 (7th Cir.1983). (There is no claim here, as there was in the *Laje* case, that the denial of an adequate hearing caused Swank monetizable emotional distress.) Swank may well fail to prove this, although in his favor is the fact that the City Council voted to discharge him by only one vote. But in the event he does finally establish liability and does succeed in proving that he would not have been fired had it not been for the violation of his procedural rights, his damages will be greater if he can show that as a result of being fired for conduct unbecoming a police officer he has been excluded from his chosen occupation.

The district court dismissed the liberty of occupation count on the ground that Swank had received a fair hearing. We disagree, but it may make no difference to the ultimate outcome. Carthage has other strings to its bow. In the district court the defendants argued that "conduct unbecoming an officer" was not a sufficiently stigmatizing ground of dismissal to deprive Swank of his liberty of occupation. Compare *Adams v. Walker*, 492 F.2d 1003, 1008–09 (7th Cir.1974), with *Hoffman v. City of Willimantic*, 680 F.Supp. 504, 507 (D.Conn. 1988). They also argued that they had not disseminated the charge publicly, as the cases seem to require. *Perry v. FBI*, 781 F.2d 1294, 1302–03 (7th Cir.1986) (en banc); *Lawson v. Sheriff of Tippecanoe County*, *supra*, 725 F.2d at 1138. Against this it can be argued that when someone is dismissed for conduct unbecoming a policeman, if the department informs any other police department to which the officer applies concerning the ground on which he was fired, the effect will be to exclude him from police work as effectively as if the department had broadcast lurid charges against him on national television. (And there was some dissemination here, although apparently only to local newspapers.) But the parties have not briefed these issues and we therefore leave them for decision by the district court on remand.

The dismissal of Swank's substantive due process and First Amendment claims is affirmed, as is the dismissal of all his claims against the individual defendants except the claim involving the police chief's statement, but otherwise the judgment of the district court is reversed and the case remanded for further proceedings consistent with this opinion. We emphasize that it will be necessary to determine on remand whether the defendants offered Swank a further evidentiary hearing after the hearing before the Public Safety Committee that produced the record on the basis of which the City Council decided to fire him.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.

MANION, Circuit Judge, concurring in part, dissenting in part.

Although I take issue with some portions of the majority's interesting discussion of substantive due process and the First Amendment, I agree with its conclusion that no fundamental rights have been affected by the City of Carthage's action. I concur with the majority in affirming the dismissal of the substantive due process claims, the First Amendment claims, and claims against various individual defendants. The only question remaining is whether the City denied Swank his "tenured position without adequate procedural safeguards against erroneous deprivations."

### I. Background

The motorcycle incident which gave rise to this case was not Gary Swank's first run-in with the Public Safety Committee. Swank previously had been accused of several job-related deficiencies including improper logging of activities, insufficient varying of his routes, improper patrolling, showing favoritism to his friends, and several instances of lying. On July 23, 1986, the Public Safety Committee notified Swank by letter that he was on "probation" until October 1, 1986. The committee stated it would terminate Swank at the end of the period if he did not improve his performance.

In the middle of the night of September 24 to 25 (near the end of the probation period), Swank gave Tina Millin, a 17–year-old student at the local college, a ride on his motorcycle. Carthage police officer Oral Lawrence observed the ride and reported it the next day to the new Police Chief, James Smart. On October 1, Smart questioned Swank and reported that Swank initially denied the incident had happened, then admitted it. Smart asked Swank if he would resign. Swank wanted time to think about it. On October 2, Smart again asked Swank if he would resign. Swank refused.

Smart drafted a list of charges against Swank for the Public Safety Committee. The committee met on October 6. Smart told the mayor, who was a member of the

committee, he had a statement from Tina Millin concerning the incident. The mayor replied the committee did not want to see the gory details, so Smart did not divulge the statement's contents. Smart presented the committee and Swank a list of seven charges relating to the motorcycle incident.[1] Bill Tomlinson chaired the meeting and questioned Swank concerning the charges. After Swank responded, Smart submitted a second page to the committee and to Swank setting forth his personal observations on the importance of maintaining the trustworthiness of the police department.[2] The committee discussed the second page after Swank and Smart left the room. When Swank returned several minutes later, Tomlinson informed him the committee had decided to suspend him with pay pending the next City Council meeting.

The Carthage City Council met on October 14, 1986. Tomlinson outlined the incident to the council and stated the Public Safety Committee had recommended immediate termination. Swank was given no opportunity to respond at the meeting (although, as will be determined on remand, Swank may have declined a full hearing). The council voted 4–3 to terminate Swank because the incident "was his third write up [and was] damaging the good relationship the city police and the city had with the college students and the college personnel."

The majority holds the hearing before the Public Safety Committee violated due process in two respects: first, Smart did not divulge the contents of Tina Millin's statement; second, Smart submitted a second page of personal observations to the committee, thus making an allegedly improper *ex parte* communication. I do not believe either of these alleged defects rises to the level of a due process violation.

1. The page Smart presented the committee read in full:

   ATTN: Mayor Nightingale & Public Safety Committee
   REF: Officer Gary Swank
   INCIDENT: Conduct Unbecoming a Police Officer
   FACTS:
   1. At approximately 1:30 am, the early morning hours of Thurs., Sept. 25, 1986, Officer Swank met a female college student at Robert Morris College Campus. They left the campus on his motorcycle and went west out of town.
   2. Officer Swank is married.
   3. Officer Swank's wife, Sally, was at home asleep.
   4. Officer Swank was off-duty, not in uniform, and on his personal motorcycle during this incident.
   5. On Wednesday, October 1, 1986, I interviewed Officer Swank about the incident. He at first lied to me about the incident and denied that the incident even occurred. He then admitted to the above mentioned facts and asked me if his wife had to be told. He then agreed to a false excuse why he was meeting with me, in case his wife asked.
   6. Officer Swank believes he did nothing wrong and does not understand why I'm reporting this incident, since he was off-duty.
   7. Officer Swank was already on probation at the time of this incident.

2. Smart's second page read in full:
   ATTN: Mayor Nightingale & Public Safety Committee

   REF: Sept. 25, 1986 Incident involving Officer Gary Swank
   MEMO:
   Much of our police work is done on and around campus. Not only do we investigate crime, enforce laws and make arrests on campus; we solve problems.

   We check on the well-being of students, at the request of their parents—who are many miles away. We discuss problem students with their parents, we've helped save the lives of many who've attempted suicide, we've guided many others away from attempting suicide, we help them when they have car trouble ... the list goes on and on. School Officials welcome us on campus. They cooperate and help us in any way that they can and vice-versa.

   This is often the first time these young persons have been away from home. They and their parents are worried. When parents of these students are worried, they call *us*. They discuss their family's darkest secrets with us. We are Police Officers. We are supposed to be trustworthy; after all, the citizens of this community bestowed this sacred trust with us when they pinned that badge on us. But we must constantly continue to earn and keep that trust. When an Officer violates that trust, he commits a grave injustice to his Department and to the citizenry that he is sworn to serve and protect—to serve and protect with his life, if necessary.

   The People do not give their Police Officers respect and unquestioned trust with the badge. The Officers must *EARN* those things—both in and out of uniform.

   This incident has tarnished OUR badge!

## II. Tina Millin's Statement

Smart offered Tina Millin's statement to the committee, but withheld it when the mayor said he did not want to hear the "gory details." The majority contends Smart's subsequent silence could be taken as an affirmation that the statement did contain gory details, thus prompting the committee members to presume the worst. In *Lee v. Hutson*, 810 F.2d 1030 (11th Cir.1987), the Eleventh Circuit addressed a substantially similar issue. Jaxie Lee was a tenured employee of the Cobb County, Georgia Sheriff's Department. She was terminated after receiving a hearing before the Cobb County Civil Service Board. Among other things, she claimed the sheriff and the county violated her due process rights by failing to present exculpatory evidence at the hearing. The court first addressed Lee's substantive due process claim. Citing *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), the court held, "[I]f a deliberate lie by governmental employer does not amount to an independent constitutional tort, then an alleged *Brady* violation during an employment hearing also fails to constitute a substantive due process violation." *Id.* at 1032–33. The court then noted "[a]lthough procedural due process might be violated if a mechanism for correcting these alleged errors were not available, Georgia does provide avenues for redress of such claims...." *Id.* at 1033. Georgia had a procedure for certiorari review, just as Illinois has in this case. *Odell v. Village of Hoffman Estates*, 110 Ill.App.3d 974, 66 Ill.Dec. 564, 566, 443 N.E.2d 247, 249 (Ill. App. 1 Dist.1982). ("Under the writ [of certiorari], the trial consists only of a review of the administrative records. The reviewing court must ascertain whether the agency had jurisdiction and acted within its jurisdiction, whether it proceeded according to law and acted on the evidence, and whether there is anything in the record which fairly tends to sustain the action of the agency.") If Smart's silence (about whether the statement was "gory") can be taken as an affirmation, and that affirmation misled the committee, its effect likewise can be no worse than that of a deliberate lie. See also *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). As in *Lee*, Smart's failure to produce Millin's statement gives rise to neither substantive nor procedural due process claims.

The majority concludes Smart's failure to disclose the contents of Tina Millin's statement violated Swank's due process rights, but holds the individual defendants free of liability under the doctrine of qualified immunity. Carthage nevertheless remains liable, but why? Assuming Smart violated Swank's rights, he did so by misrepresenting the facts to the Public Safety Committee. The committee itself did nothing to encourage the misrepresentation. The mayor simply stated he did not want to hear the gory details; Smart could have responded, "The details might not be as gory as you suspect." The wrong, if any, was committed by Smart, not the committee. Therefore the City of Carthage is liable only if Smart had "final policymaking authority" as a matter of state law. *Jett v. Dallas Independent School District*, ─── U.S. ───, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989). But he did not have that authority. The final policymaking authority for Swank's termination in this case rested with the City Council—Smart and the Public Safety Committee merely made recommendations. Under *Jett*, the City of Carthage is not liable for Smart's actions.

## III. Smart's *Ex Parte* Communication

I have no difficulty characterizing Smart's second page as an *ex parte* communication even though Swank received a copy at the same time as the committee. However, as this court concluded in *Shidaker v. Carlin*, 782 F.2d 746, 752 (7th Cir.1986), judgment vacated on other grounds, *Tisch v. Shidaker*, 481 U.S. 1001, 107 S.Ct. 1621, 95 L.Ed.2d 195 (1987), "[n]ot every *ex parte* communication is a procedural defect so substantial and so likely to cause prejudice that it entitles the claimant to an entirely new administrative proceeding." *Ex parte* evidence is not fatal if it is cumulative. *Shidaker*, 782 F.2d at 753. Even an *ex parte* charge (as opposed to mere evidence or argument) was held

harmless in *Shidaker*.[3] "Many ... cases have found *ex parte* communications in administrative hearings to be harmless error." *Id.*

The issue is whether the deprived party receives notice and a chance to offer his side of the story. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985). If the *ex parte* communication is cumulative, the deprived party essentially has received notice by virtue of the prior non-*ex parte* charges and evidence. That is the case here. Swank knew the committee was considering recommending termination because of the motorcycle incident. He knew he was accused of conduct unbecoming a police officer. The *ex parte* communication only related Smart's assessment of the incident's possible damage. Swank must have known that any damage due to the incident was an issue. He had been warned of other misconduct and was on probation. This single and relatively benign *ex parte* communication did not so prejudice Swank's interests as to poison the hearing. It was at most harmless error, and as such did not rise to the level of a due process violation. *Shidaker*, 782 F.2d at 752.

## IV. The Alleged Deprivation Arose From Random and Unauthorized Conduct

For the above stated reasons, I believe the Public Safety Committee hearing satisfied due process. However, under *Parratt*

*v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), we should not even reach the issue of the hearing's validity.

Under *Parratt v. Taylor* and *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), random and unauthorized acts by state agents, even if intentional, do not violate procedural due process requirements so long as the state provides a "meaningful post-deprivation remedy." In Illinois, "an interested party who has been aggrieved by a ruling of an administrative body has a right to have the proceeding reviewed by the common law writ of certiorari." *Odell v. Village of Hoffman Estates, supra*, 66 Ill.Dec. at 566, 443 N.E.2d at 249. Granted, this review may not provide all the remedies Swank has under § 1983, but a certiorari procedure is a meaningful post-deprivation remedy under *Parratt* and *Hudson*. See also *Lee v. Hutson, supra*, 810 F.2d at 1033.

The City of Carthage's employment manual specifies a termination procedure for all city employees.[4] When an employee is performing unsatisfactorily, his supervisor must meet with him and give him a written list of the evidence of any deficiencies. If the employee's unsatisfactory behavior continues, the supervisor must meet with him two more times before recommending termination to the appropriate committee of the City Council. The committee's chairman will then notify the employee of his termination.

The record contains no evidence the City either formally repealed the manual's ter-

---

**3.** In *Shidaker*, the aggrieved party had a chance to cure the procedural defect at a subsequent *de novo* hearing. There is some dispute as to whether Swank had a similar opportunity. However, the *Shidaker* court found the *ex parte* contact "already unlikely to do any harm" before the *de novo* hearing was even taken into consideration. *Shidaker*, 782 F.2d at 753.

**4.** The employment manual provides in full at section II.E:

Termination of an employee for unsatisfactory performance may occur after the employee's immediate supervisor has met with the employee 3 times. The first time the supervisor will list in writing those things that he or she feels are evidence of poor performance and make suggestions as to what the employee should do to correct the deficiencies. The list will be dated. On the second

occasion the supervisor will review the list and point out those items in which the employee has not improved and point out that if the deficiencies are not corrected by a date which is indicated in writing that the employee will be recommended for termination. At the third meeting, the supervisor will indicate to the employee which deficiencies have not been corrected and will then recommend his or her termination to the appropriate committee of the City Council.... The employee will then be notified by letter or in person of his or her termination by the chairman of the appropriate committee. IMMEDIATE termination of an employee will normally occur only if the employee threatens or carries out physical harm or other gross misconduct to a fellow employee or supervisor which is unprovoked.

mination provision or effectively repealed that provision by routinely ignoring it. The manual's procedure was the City's policy at the time of the motorcycle incident. Therefore, the manual's termination procedure should have been used in Swank's case. Swank alleges at ¶ 20 of his complaint that defendants failed to follow the manual's procedure. The facts support this allegation. The defendants had no authority to supplant the manual's procedure with the probation-hearing-termination procedure used in this case. This isolated instance of ignoring the established termination procedure was truly random and unauthorized.[5] Under *Parratt*, defendants cannot be held liable for violating Swank's procedural due process rights.[6]

I respectfully dissent.

**5.** The Supreme Court's recent analysis of *Parratt* (*Zinermon v. Burch,* —— U.S. ——, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)), does not affect the outcome here. In *Zinermon,* Burch alleged that defendant hospital officials committed him to state mental facilities without properly determining whether he was competent to give informed consent. Because the state delegated to the hospital administrators both the power to confine and the authority to initiate safeguards against unlawful confinement, the Court held that the decision was not random or unauthorized. In *Zinermon,* the state could foresee that

disoriented mental patients might sign consent forms; therefore, the Court held state procedures should guard against this. In this case, Smart ignored established state termination procedure. His conduct was unforeseeable from the state's perspective, and *Parratt* does apply.

**6.** The parties did not argue this issue on appeal. However, "[a] reviewing court can affirm a judgment on any ground, if the record discloses a fair basis for doing so." *Klingman v. Levinson,* 877 F.2d 1357, 1360 n. 3 (7th Cir.1989).