**Kevin MERCURE, Plaintiff,**

v.

**VAN BUREN TOWNSHIP, Helen Foster, Mark Perkins, and Dennis Brooks, Defendants.**

No. 99–70820.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 31, 2000.

<hr>

Michael A. Rataj, Dearborn, MI, for Plaintiff.

Suzanne P. Bartos, Livonia, MI, for Defendants.

### OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. *INTRODUCTION*

Plaintiff Kevin Mercure commenced this suit on January 26, 1999, in Wayne County Circuit Court, State of Michigan, asserting various federal constitutional and state-law claims arising from his discharge as a police officer for Defendant Van Buren Township (the "Township"). Among other claims, Plaintiff alleges that his employment was unlawfully terminated in violation of the U.S. and Michigan Constitutions after it was discovered that he was having an affair with the estranged wife of a fellow Township police officer, Sergeant Fred Yono. On February 24, 1999, Defendants removed the case to this Court, citing Plaintiff's assertion of federal claims under 42 U.S.C. § 1983.

By motion filed on September 17, 1999, Defendants now seek summary judgment on Plaintiff's federal claims, arguing. Plaintiff responded to this motion on November 5, 1999, and Defendants filed a reply brief in further support of their motion on November 12, 1999.[1]

On January 18, 2000, the Court held a hearing on Defendants' motion. Having reviewed the briefs and supporting materials submitted by the parties, and having considered the arguments of counsel at the January 18 hearing, the Court is now prepared to rule on this motion. This Opinion and Order sets forth the Court's ruling.

### II. *FACTUAL AND PROCEDURAL BACKGROUND*

#### A. The Parties

Although the parties and their counsel have presented a lengthy record for the Court's consideration, much of it consisting of irrelevant "background" information, rumors, unsupported allegations, and inadmissible hearsay, the relevant facts of this case are straightforward and largely undisputed. Plaintiff Kevin Mercure was employed by Defendant Van Buren Township, first as a reserve officer from Sep-

---

1. Defendants also filed a supplemental brief in support of their motion on January 10, 2000. Because this brief was filed only shortly before the hearing on Defendants' motion, and because there is no provision in the Local Rules for this District which authorizes the filing of such a brief, the Court will not consider this supplemental brief or its attached exhibits in deciding Defendants' motion.

tember of 1995 until July of 1996, and then as a fully certified police officer from November of 1996 until his discharge on or around July 16, 1998. In this suit, Plaintiff challenges this discharge, as well as the investigation leading up to it, on constitutional and other grounds.

Apart from the Township, also named as Defendants are Mark Perkins, the Township's Director of Public Safety, Helen Foster, a Township supervisor, and Dennis Brooks, a sergeant on the Township police force. As the head of the Township's police force, Defendant Perkins made the decision to discharge Plaintiff, and Defendant Foster upheld this determination. Defendant Brooks conducted the investigation that uncovered Plaintiff's relationship with the wife of Sergeant Yono.

## B. The Events Leading to Plaintiff's Discharge

In December of 1997 or January of 1998, Plaintiff began a relationship with Sergeant Yono's wife, Joanna Yono.[2] Plaintiff has testified that he first had sexual intercourse with Ms. Yono in late January or early February of 1998. At the time, Ms. Yono was estranged from her husband, and they subsequently divorced in February of 1999. Sergeant Yono has testified, however, that he still lived with Ms. Yono until early July of 1998, and that he and his wife did not file for a divorce until November of 1998. (Defendants' Motion, Br. in Support, Ex. A, Arbitration Hearing at 16–17.)[3]

During this time, Plaintiff worked under Sergeant Yono on the day shift. According to Defendants, because of the relative-

ly small size of the Township police force, consisting of Defendant Perkins, one lieutenant, four sergeants, and twenty-six officers, it was not uncommon for the sergeant in charge of a shift to be "on the road" with his officers.

On or around July 14, 1998, Defendant Brooks learned of Plaintiff's relationship with Ms. Yono from another officer, and apparently took it upon himself to investigate further. Accordingly, in the early morning hours of July 14, he drove to the address where Ms. Yono currently was residing, at a trailer park on Belleville Road. He was accompanied in this investigation by Officer Dolan, traveling in a separate vehicle, and eventually all four patrol cars on the night shift arrived at a parking lot across from Ms. Yono's mobile home. The officers observed Plaintiff's car parked in the driveway in front of Ms. Yono's residence, and Defendant Brooks and Officer Dolan took several Polaroid pictures of Plaintiff's vehicle.

Defendant Brooks then returned to the police station, and placed the photographs on the ledge of a blackboard in the squad room. He selected "the best picture out of the group," placed it on the roll call table, and discarded the rest. (Defendants' Br., Ex. A, Arbitration Hearing at 39.) Although Defendant Brooks testified that he left the picture on the table only long enough to go to the bathroom, (id. at 39–40), Plaintiff has testified that he was called later that day and told that the picture had been posted on a bulletin board in the department's roll call room, with the caption, "754 is at 714's half

---

**2.** After her divorce from Sergeant Yono, Mrs. Yono returned to using her maiden name, Joanna Komisar. More recently, following her marriage to Plaintiff on October 2, 1999, she now goes by the name of Joanna Mercure.

**3.** The parties dispute when Sergeant Yono first became aware of the relationship between his wife and Plaintiff. Sergeant Yono testified that he did not learn of this affair until July 14, 1998, (id. at 17–18), but Ms. Yono has characterized this claim as "non-

sense," stating that "I personally told Mr. Yono that I was dating [Plaintiff] on many occasions." (Plaintiff's Response Br., Ex. 8, Joanna Mercure Aff. at ¶ 5.) Plaintiff likewise has testified that Sergeant Yono knew of the relationship, or at least that he and Ms. Yono were seeing each other on a social basis, and that Sergeant Yono asked only that he not "flaunt it around the department." (Defendants' Br., Ex. A, Arbitration Hearing at 162–63.)

unit—what's up with that." (*Id.* at 150–51.)[4] Plaintiff further testified, however, that he did not actually see the pictures or caption on the bulletin board. (*Id.* at 172.)

That same day, at around 4:00 p.m., Plaintiff was called to the station to meet with Lieutenant Kenneth Brooks and the three sergeants other than Sergeant Yono. According to Plaintiff, Lieutenant Brooks informed him of "rumors" of his relationship with Ms. Yono, stated that it was Plaintiff's "personal business," but expressed concerns for the safety of Plaintiff and Sergeant Yono and the liability of the department. (*Id.* at 154.) Defendant Brooks, Lieutenant Brooks' brother, stated that "if it was [his] wife, he'd put a bullet in [Plaintiff's] head," and that if Plaintiff needed backup, his "backup might not come." (*Id.* at 154.) The officers also asked Plaintiff to end his relationship with Ms. Yono, but he replied that he would not. (*Id.* at 173–74.)

Plaintiff then was summoned to meet with Defendant Perkins. This meeting also was attended by Phillip Wakeford, the chief union steward. According to Plaintiff, Defendant Perkins asked whether he would be willing to end his relationship with Ms. Yono, and Plaintiff responded that he "wasn't going to end it." (*Id.* at 176.) Defendant Perkins then advised Plaintiff that he either had to resign or would be terminated, and he suspended Plaintiff without pay. The next day, July 15, 1998, Defendant Perkins again met with Plaintiff, and again gave Plaintiff the option of resigning or termination.[5]

When Plaintiff refused to resign, Defendant Perkins informed him, by letter dated July 16, 1998, that his employment was being terminated. (Defendants' Br., Ex. D.) In this letter, Defendant Perkins stated that Plaintiff had violated two rules of conduct governing the Township police force: Rule 7120.10.3, prohibiting "unprofessional conduct" which "discredits the officers and/or the department or which impairs the operation and efficiency of the department or the officer," and Rule 7120.10.4, requiring officers to "maintain a level of moral conduct in their personal and business affairs which is in keeping with the highest standards of the law enforcement profession," and prohibiting participation in "any incident involving moral turpitude which impairs [an officer's] ability to perform as [a] law enforcement officer[ ] or causes the department to be brought into disrepute." (*Id.*) On September 3, 1998, Defendant Foster upheld Defendant Perkins' decision to discharge Plaintiff. (Plaintiff's Response Br., Ex. 13.)

## C. Procedural Background

Plaintiff brought this suit on January 26, 1999 in Wayne County Circuit Court, State of Michigan. His Complaint includes eight counts: (1) violation of his rights under the U.S. and Michigan Constitutions of free association and privacy; (2) violation of his state and federal constitutional rights of due process; (3) municipal liability for these constitutional violations, by virtue of the actions of the two Defendants allegedly holding policy-making positions, Defendants Perkins and Foster; (4) a state-law claim of wrongful discharge; (5) a state-law claim of discharge in violation of public policy; (6) a state-law claim of assault and

---

4. The number "754" is Plaintiff's badge number, and "714" is Sergeant Yono's badge number. The term "half unit" is police jargon for a wife or girlfriend. (*Id.* at 151.)

5. According to Plaintiff, after he left this July 15 meeting, Defendant Perkins approached him and demanded to know whether he tape recorded the meeting. When told that Plaintiff had taped the meeting, Defendant Perkins allegedly grabbed Plaintiff, threw him against the wall, and forcibly removed the tape recorder from his pocket. When Defendant Perkins subsequently returned the tape recorder, the portion of the tape capturing this alleged assault had been erased. Based on this incident, Plaintiff's claims in this case include a state-law claim of assault and battery against Defendant Perkins. However, Defendants do not address this claim in their present motion, but only the federal claims.

battery against Defendant Perkins, arising from the incident following their July 15, 1998 meeting; (7) a state-law claim of intentional infliction of emotional distress; and (8) civil conspiracy to violate Plaintiff's constitutional rights.[6] The principal basis for Plaintiff's federal constitutional claims is that Defendants improperly investigated his private sexual activities and discharged him on account of those activities, in violation of his First and Fourteenth Amendment rights of privacy and free association. Defendants removed the action to this Court on February 24, 1999, based on Plaintiff's assertion of federal constitutional claims under 42 U.S.C. § 1983.

Plaintiff also challenged his discharge through the union grievance procedure. On April 12, 1999, arbitrator Carl Cohen took testimony on this grievance. On June 21, 1999, the arbitrator issued his ruling, upholding Defendants' decision to discharge Plaintiff, but awarding back pay to Plaintiff for the period from his suspension on July 14, 1998 to the date of the arbitration hearing. In so ruling, the arbitrator found that "[t]he operation and efficiency of the [Township Police] Department were adversely affected, and would be more gravely affected were Officer Mercure reinstated." (Defendants' Br., Ex. C, Arbitrator Decision at 8.) The arbitrator also "recognize[d] the force" of the Union's position that "private acts of police officers, and especially their private sex lives, are not legitimate grounds for discipline," but found that "[i]n this case the acts did not remain genuinely private." (*Id.*) However, the arbitrator found that other Township police officers shared the blame for "the notoriety of the matter," and accordingly concluded that an award of back pay was appropriate. (*Id.* at 6, 8–10.)

In the present motion, filed on September 17, 1999, Defendants seek summary judgment in their favor on Plaintiff's federal claims only. In support of this motion, Defendants argue that the individual Defendants are entitled to qualified immunity, that Plaintiff has failed to establish a basis for municipal liability, that the discharge of Plaintiff did not violate his constitutional rights, and that Plaintiff has failed to set forth a viable claim of civil conspiracy. Plaintiff filed a response in opposition to this motion on November 5, 1999, and Defendants filed a reply in further support of their motion on November 12, 1999. Finally, on January 18, 2000, the Court heard the argument of counsel in support of and opposition to this motion.

## III. *ANALYSIS*

### A. The Standards Governing Defendants' Motion

In their present motion, Defendants seeks summary judgment in their favor on Plaintiff's federal constitutional claims. Under the relevant Federal Rule, summary judgment is proper " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment.[7] According to the *Celotex* Court:

---

**6.** By stipulated Order dated March 26, 1999, Counts II, IV, and V of Plaintiff's Complaint were dismissed with prejudice.

**7.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful tri-

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

■ After reviewing the above trilogy, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in deciding Defendants' motion.

## B. Plaintiff Has Failed to Identify a Constitutionally Protected Interest Abridged by His Discharge.

Although the principal focus of Defendants' motion is the defense of qualified immunity, the Court believes it necessary to first address two more fundamental questions before considering the applicability of this defense. First, absent the infringement of a constitutionally protected interest, Plaintiff cannot succeed in his claims under 42 U.S.C. § 1983, and Defendants need not appeal to qualified immunity. Next, even if Plaintiff succeeds in identifying a constitutional right implicated by Defendants' actions, Defendants still are entitled to prevail if they show that the Township's interest as employer in providing effective law enforcement services to the community outweighs Plaintiff's interest in engaging in conduct which he asserts is constitutionally protected. Only if both of these issues are resolved in Plaintiff's favor does the Court then reach the issue of qualified immunity. Yet, as discussed below, both of these antecedent issues represent insurmountable obstacles to Plaintiff's federal constitutional claims in this case.

■ First, as Plaintiff recognizes, and as confirmed by the language of the statute from which Plaintiff's federal claims arise, there can be no liability under 42 U.S.C. § 1983 absent a deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See also Dunn v. State of Tennessee*, 697 F.2d 121, 125 (6th Cir. 1982). In his Complaint, Plaintiff alleges

als." 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 33 (1993 Supp.).

that Defendants abridged his free association and privacy rights under the First and Fourteenth Amendments to the U.S. Constitution. Upon reviewing the applicable case law, however, the Court finds that these constitutional protections do not extend to the conduct that led to Plaintiff's discharge as a police officer. It follows that Defendants' decision to discharge Plaintiff, whether questionable or even wrongful in some other respect, simply does not rise to the level of the constitutional violation alleged by Plaintiff.

The first of the rights cited by Plaintiff, freedom of association, cannot be found in the plain text of the Bill of Rights, but nevertheless has been recognized in the case law, in two distinct forms. First, the Supreme Court has identified "a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. United States Jaycees*, 468 U.S. 609, 618, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984). There can be no contention that the personal relationship at issue here, between Plaintiff and the wife of a fellow officer, qualifies as this type of "expressive" activity. Rather, this case is similar in this respect to *City of Dallas v. Stanglin*, 490 U.S. 19, 24, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989), which held that an ordinance prohibiting teenagers from gaining admission to certain dance halls did not implicate "the sort of expressive association that the First Amendment has been held to protect." As explained by the *Stanglin* Court:

> It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment. We think the activity of these dance-hall patrons—coming together to engage in recreational danc-

ing—is not protected by the First Amendment.

490 U.S. at 25, 109 S.Ct. at 1595; *see also Swank v. Smart*, 898 F.2d 1247, 1251 (7th Cir.1990) (noting that the right of "expressive association" is meant to "protect the market in ideas," so that "[c]asual chit-chat between two persons or otherwise confined to a small social group is unrelated, or largely so, to that marketplace, and is not protected").

▪ Next, the Supreme Court has recognized a right of non-expressive or "intimate" association, reasoning that "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Roberts*, 468 U.S. at 617–18, 104 S.Ct. at 3249. Some decisions appear to suggest that this right arises from the First Amendment. *See, e.g., Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545, 107 S.Ct. 1940, 1946, 95 L.Ed.2d 474 (1987); *Shahar v. Bowers*, 114 F.3d 1097, 1102 n. 9 (11th Cir.1997). The better view, however, is that the right of intimate association is one of the fundamental individual liberties protected under the "substantive" aspect of the Due Process Clause of the Fourteenth Amendment. *See, e.g., Bowers v. Hardwick*, 478 U.S. 186, 190–92, 106 S.Ct. 2841, 2843–44, 92 L.Ed.2d 140 (1986); *Hughes v. City of North Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996); *Swank*, 898 F.2d at 1251–52.

▪ Regardless of its source, this right is not without its limits. It particular, the Supreme Court has emphatically rejected "the proposition that any kind of private sexual conduct between consenting adults is constitutionally insulated from state proscription." *Bowers*, 478 U.S. at 191, 106 S.Ct. at 2844. Rather, the *Bowers* Court characterized the fundamental rights recognized in prior decisions, including the right of intimate association, as "those fundamental liberties that are 'implicit in the

concept of ordered liberty,' such that 'neither liberty nor justice would exist if [they] were sacrificed,' " and "those liberties that are 'deeply rooted in this Nation's history and tradition.' " 478 U.S. at 191–92, 106 S.Ct. at 2844 (citations omitted). Moreover, the Court expressed its reluctance to "take a more expansive view of our authority to discover new fundamental rights imbedded in the Due Process Clause," observing that "[t]he Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution." 478 U.S. at 194, 106 S.Ct. at 2846.

The same holds true for the other constitutional right cited by Plaintiff, the right of privacy. This right, like the right of association, has been recognized in two general forms: "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977) (footnotes omitted). Although, as discussed below, Plaintiff alleges that the first form of privacy right was infringed during Defendants' investigation of his conduct, his complaint about his discharge primarily involves the second form of privacy interest, which, in this case, can perhaps best be termed a right to "sexual privacy." *See Briggs v. North Muskegon Police Dep't*, 563 F.Supp. 585, 589 (W.D.Mich.1983), *aff'd without opinion*, 746 F.2d 1475 (6th Cir.1984). Plainly, this right and the right of intimate association are closely related and, thus, may be analyzed together. *See Fleisher v. City of Signal Hill*, 829 F.2d 1491, 1499–1500 (9th Cir.1987); *Briggs*, 563 F.Supp. at 588–90.

Although there is no consensus in the case law as to the precise contours of the "sexual privacy" and "intimate association" rights at issue here, the Court readily concludes that these rights do not encompass Plaintiff's conduct in this case. It is undisputed that Plaintiff and Ms. Yono began their relationship in December of 1997 or January of 1998, that this relationship became sexual in late January or early February of 1998, and that, throughout this time, Ms. Yono was married to Plaintiff's fellow officer, Sergeant Fred Yono. The record further shows that Ms. Yono remained married to Sergeant Yono until February of 1999, well after Plaintiff was discharged in July of 1998. Thus, at all relevant times from early 1998 until his discharge, Plaintiff was maintaining an intimate sexual relationship with a woman married to his superior officer.

There are many problems with recognizing this relationship as constitutionally protected, not the least of which is that Michigan law deems it a felony. Michigan's penal code defines adultery as "the sexual intercourse of 2 persons, either of whom is married to a third person," Mich. Comp Laws § 750.29, and further provides:

Any person who shall commit adultery shall be guilty of a felony; and when the crime is committed between a married woman and a man who is unmarried, the man shall be guilty of adultery, and liable to the same punishment.

Mich.Comp.Laws § 750.30. As the Texas Supreme Court recently observed, Michigan is by no means unique in this prohibition:

Prohibitions against adultery have ancient roots. In the latter half of the 17th century in England, adultery was a capital offense. The common law brought to this country by the American colonists included the crime of adultery as previously defined by the canon law of England. Adultery was still considered a crime by courts and commentators in the latter half of the 19th century when the Fourteenth Amendment. In fact, adultery is a crime today in half of the states and the District of Columbia.

*City of Sherman v. Henry*, 928 S.W.2d 464, 470 (Tex.1996) (citations and footnote omitted).

Thus, the claimed right in this case is not unlike the right at issue in *Bowers,* the asserted "fundamental right to engage in homosexual sodomy." 478 U.S. at 191, 106 S.Ct. at 2844. In declining to extend constitutional protection to this activity, even if consensual and performed in private, the Court found it noteworthy that "[p]roscriptions against that conduct have ancient roots," that "when the Fourteenth Amendment was ratified, all but 5 of the 37 States in the Union had criminal sodomy laws," and that "24 States and the District of Columbia continue to provide criminal penalties for sodomy performed in private and between consenting adults." 478 U.S. at 193–94, 106 S.Ct. at 2845–46. Given these similar and historically rooted prohibitions against sodomy and adultery, the Court's conclusion in *Bowers* applies as well here: "Against this background, to claim that a right to engage in such conduct is 'deeply rooted in this Nation's history and tradition' or 'implicit in the concept of ordered liberty' is, at best, facetious." 478 U.S. at 194, 106 S.Ct. at 2846; *see also Fleisher,* 829 F.2d at 1498 (noting that "[t]he illegality of [the plaintiff police officer's] behavior creates a substantial barrier to his successfully asserting a privacy claim"); *Cronin v. Town of Amesbury,* 895 F.Supp. 375, 384 (D.Mass.1995) (citing "wide agreement" in the case law "that off-duty sexual activities are not protected when they violate a statute"), *aff'd,* 81 F.3d 257 (1st Cir.1996).

Plaintiff argues, however, that Michigan's adultery statutes are "archaic" and "never enforced." (Plaintiff's Response Br. at 12.) This, even if true, is largely beside the point. As cautioned in *Bowers,* there should be "great resistance to expand the substantive reach" of the Fourteenth Amendment's Due Process Clause, because "[o]therwise, the Judiciary necessarily takes to itself further authority to govern the country without express constitutional authority." 478 U.S. at 195, 106 S.Ct. at 2846. At a minimum, even if there were no criminal proscription against the conduct he engaged in, Plaintiff still would be required to establish some link or

appropriate analogy between his conduct and the "fundamental liberties" recognized in prior Supreme Court decisions.

Not surprisingly, Plaintiff has failed to suggest how his decision to enter into a relationship with a married woman is comparable to decisions deemed private by the Supreme Court: specifically, certain fundamental decisions relating to marriage, procreation, contraception, family relationships, and child rearing and education. *See Carey v. Population Servs. Int'l,* 431 U.S. 678, 685, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977) (summarizing the privacy rights previously recognized by the Court). *See also FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 237, 110 S.Ct. 596, 611, 107 L.Ed.2d 603 (1990) (rejecting a constitutional "intimate association" challenge to an ordinance requiring motel owners to obtain a special license to rent rooms for less than ten hours, reasoning that "[a]ny 'personal bonds' that are formed from the use of a motel room for fewer than 10 hours are not those that have 'played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs'" (citation omitted)). Plaintiff's behavior here is not comparable to any of these fundamental matters of personal choice that lie at the core of traditional notions of individual liberty. Indeed, as the Texas Supreme Court noted, "adulterous conduct is the very antithesis of marriage and family." *Henry,* 928 S.W.2d at 469–70.

Admittedly, some courts have held to the contrary, finding at least a limited right to sexual privacy regardless of the marital status of the parties to the relationship. *See, e.g., Thorne v. City of El Segundo,* 726 F.2d 459, 468–71 (9th Cir. 1983) (holding that the plaintiff police officer applicant's privacy and free association rights were violated when the defendant city questioned her about her sexual activities and conditioned her employment on answering such questions); *Briggs, supra,*

563 F.Supp. at 590 (holding that the dismissal of the plaintiff, a married police officer, following the discovery that he was living with a married woman not his wife abridged his "constitutional right of sexual privacy"). These decisions, however, came in what could be termed the "heyday" of judicial recognition of "fundamental rights," before the Supreme Court unequivocally signaled in *Bowers* its unwillingness to expand the list of such rights. Even then, the holdings in these cases were carefully limited to their facts, and both were subsequently distinguished on the ground that the conduct at issue in later cases was not purely "private," as in *Briggs* and *Thorne*, but instead affected the plaintiff's performance as a police officer. *See Fleisher, supra*, 829 F.2d at 1498–99 (distinguishing *Thorne*); *Jackson v. Howell*, 577 F.Supp. 47, 49–50 (W.D.Mich.1983) (distinguishing *Briggs*). Thus, in *Hughes, supra*, the Sixth Circuit observed that "[t]he significance of *Briggs* lies in the fact that the officer in that case was dismissed solely because of his living status, without any reference as to how that status could have affected his performance as an officer." 93 F.3d at 242.[8]

Indeed, in light of *Bowers*, it is not clear what remains of *Briggs'* recognition of a broad right of "sexual privacy" encompassing intimate relationships of any sort, so long as they are truly "private." *Bowers* specifically rejects the notion that an activity can claim constitutional protection simply by virtue of being purely "private":

> Respondent ... asserts that the result should be different where the homosexual conduct occurs in the privacy of the home. He relies on *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), where the Court held that the First Amendment prevents conviction for possessing and reading obscene material in the privacy of one's home: "If the First Amendment means anything, it means that a State has no

business telling a man, sitting alone in his house, what books he may read or what films he may watch." *Id.*, at 565, 89 S.Ct. at 1248.

> *Stanley* did protect conduct that would not have been protected outside the home, and it partially prevented the enforcement of state obscenity laws; but the decision was firmly grounded in the First Amendment. The right pressed upon us here has no similar support in the text of the Constitution, and it does not qualify for recognition under the prevailing principles for construing the Fourteenth Amendment. Its limits are also difficult to discern. Plainly enough, otherwise illegal conduct is not always immunized whenever it occurs in the home. Victimless crimes, such as the possession and use of illegal drugs, do not escape the law where they are committed at home. *Stanley* itself recognized that its holding offered no protection for the possession in the home of drugs, firearms, or stolen goods. *Id.*, at 568, n. 11, 89 S.Ct., at 1249, n. 11. And if respondent's submission is limited to the voluntary sexual conduct between consenting adults, it would be difficult, except by fiat, to limit the claimed right to homosexual conduct while leaving exposed to prosecution adultery, incest, and other sexual crimes even though they are committed in the home. We are unwilling to start down that road.

478 U.S. at 195–96, 106 S.Ct. at 2846.

This Court, likewise, declines to travel down a different but entirely analogous road. Just as the *Bowers* Court was unwilling to confer constitutional protection upon one form of voluntary and consensual sexual conduct that a significant number of states still deem illegal, this Court also is hesitant to recognize a constitutionally protected interest in a different form of sexual conduct that remains prohibited in many states, including Michigan. Indeed, even assuming Plaintiff's conduct here was

---

8. As discussed below, this distinction is fully applicable here, where Plaintiff's conduct could reasonably be viewed as bearing upon his on-the-job performance.

every bit as "private" as the conduct at issue in *Bowers,* and even assuming this public/private distinction has legal significance in determining whether an activity is constitutionally protected, an adulterous relationship simply cannot claim the "victimless" and fully consensual status of the conduct in *Bowers.* Rather, the Michigan Supreme Court has recognized that Michigan's adultery law "guards the sanctity of marriage" by "protect[ing] each nonparticipating spouse." *People v. Lipski,* 328 Mich. 194, 197, 43 N.W.2d 325, 326 (1950).

Consequently, regardless of Sergeant Yono's particular feelings about his wife's relationship with Plaintiff in this case, and regardless of the strength of the Yonos' marriage by the time Ms. Yono began her relationship with Plaintiff, the Court fails to see how conduct that is widely viewed as subject to reproach, is contrary to the institution of marriage sanctioned by the State, and is prohibited under Michigan's penal code can be elevated to the status of constitutionally protected behavior. Moreover, the Court is unwilling to invite judicial scrutiny of the intimate details of personal relationships by holding that the existence or absence of a constitutionally protected interest in an adulterous relationship turns upon the strength of the parties' marriages or the feelings of those affected. Accordingly, because Plaintiff was not engaged in constitutionally protected activity, Defendant's decision to discharge him for his adulterous relationship with the wife of a fellow officer cannot give rise to liability under 42 U.S.C. § 1983.

**C. Even If Plaintiff's Termination Implicated a Liberty Interest Protected by the Constitution, Defendants Have Established an Adequate Justification for Their Discharge Decision.**

 As discussed above, the Court has concluded that Plaintiff's conduct does not lie at the core of any express constitutional guarantee, and that it also cannot be viewed as the exercise of a more general, constitutionally protected interest in privacy or intimate association. Yet, even if the Court were to hold, to the contrary, that Plaintiff's actions implicate some form of "non-core" liberty interest, the deprivation of such an interest still cannot support a claim under 42 U.S.C. § 1983 unless it is "arbitrary" and "utterly unreasonable." *See Swank, supra,* 898 F.2d at 1252. In *Kelley v. Johnson,* 425 U.S. 238, 244, 248, 96 S.Ct. 1440, 1444, 1446, 47 L.Ed.2d 708 (1976), for example, the Court assumed that a regulation limiting the length of a police officer's hair implicated "some sort of 'liberty' interest within the Fourteenth Amendment in matters of personal appearance," and then proceeded to hold that this regulation was not "so irrational that it may be branded 'arbitrary,' and therefore a deprivation of [the officer's] 'liberty' interest in freedom to choose his own hairstyle." Accordingly, in this case, the Court likewise will assume for the moment that Plaintiff's conduct implicates a liberty interest within the Fourteenth Amendment (though no such interest is apparent), and will now turn to the question whether Defendants' decision to discharge Plaintiff was so irrational as to be deemed arbitrary.

In addressing this question, it is important to bear in mind the employer/employee relationship that existed between Plaintiff and Defendants. While a citizen does not surrender his constitutional rights upon becoming a public employee, the Supreme Court nevertheless has cautioned that "government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers,* 461 U.S. 138, 143, 103 S.Ct. 1684, 1688, 75 L.Ed.2d 708 (1983); *see also Kelley,* 425 U.S. at 244–45, 96 S.Ct. at 1444–45; *Shahar, supra,* 114 F.3d at 1102; *Swank,* 898 F.2d at 1252. Thus, in *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968), and its progeny, the Court adopted a balancing test, weighing the employee's liberty inter-

est as a citizen against the "interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

The proper calibration of this balance depends upon the gravity of the employee's liberty interest, as well as the degree of the State's interest in governing a particular workplace. In *Kelley*, for example, the Court noted that it had previously upheld "comprehensive and substantial restrictions upon activities of both federal and state employees lying at the core of the First Amendment," and reasoned that "there is surely even more room for restrictive regulations of state employees where the claim implicates only the more general contours of the substantive liberty interest protected by the Fourteenth Amendment." 425 U.S. at 245, 96 S.Ct. at 1445. The Court further found that state regulations governing law enforcement personnel are entitled to a "presumption of legislative validity," where "[t]he promotion of safety of persons and property is unquestionably at the core of the State's police power." 425 U.S. at 247, 96 S.Ct. at 1445–46; *see also Kukla v. Village of Antioch*, 647 F.Supp. 799, 809 (N.D.Ill.1986) ("The government has more justification for regulating the private life of a policeman than that of a teacher.").

In this case, both sides of the *Pickering* balance suggest that due deference should be given to Defendants' employment decision. Plainly, having already found that Plaintiff's conduct does not implicate even a lesser, "non-core" liberty interest, the Court cannot conclude that any such liberty interest held by Plaintiff is so strong as to render an infringement of it inherently suspect. Rather, as with the hair-length regulation at issue in *Kelley*, Defendants' actions here pass constitutional muster so long as they were not "irrational" or "arbi-

trary." Moreover, given the importance of effective law enforcement, a function that lies at the core of the State's police power, Defendants are entitled to a significant degree of deference in their management and operation of the Township police department.

In light of these considerations, the Court readily concludes that Defendants' decision to discharge Plaintiff was not arbitrary or irrational. As noted, Plaintiff's conduct appears to have violated Michigan's prohibition against adultery, a law that presumably reflects the judgment of Michigan's citizenry that such behavior is wrongful. In a letter informing Plaintiff of the reasons for his discharge,[9] Defendant Perkins first cited this law, and then stated that "[a]s law enforcement officers, we live by a code of ethics that speaks to recognizing our badge of office as a symbol of public faith." (Plaintiff's Response Br., Ex. 12, at 2.) Defendant Perkins then concluded that Plaintiff had violated a departmental rule requiring that officers must "maintain a level of moral conduct in their personal and business affairs which is in keeping with the highest standards of the law enforcement profession," and that "[o]fficers shall not participate in any incident involving moral turpitude which ... causes the department to be brought into disrepute." (*Id.* (quoting Rule of Conduct 7120.10.4).) This reasoning alone would suffice to establish that Defendants' decision was not "so irrational that it may be branded 'arbitrary.'" *Kelley*, 425 U.S. at 248, 96 S.Ct. at 1446; *see also Bowers*, 478 U.S. at 196, 106 S.Ct. at 2846–47 (finding that "notions of morality" were adequate to provide the necessary "rational basis" for Georgia's sodomy law); *Fleisher, supra*, 829 F.2d at 1499 ("It is understandable that the [defendant's police] Depart-

---

**9.** It should be noted that Plaintiff does not contend that Defendant Perkins acted for reasons other than those stated in the letter. Instead, he argues that these reasons are constitutionally infirm, and also, as discussed below, that Defendants are guilty of "hypocrisy"

in their failure to take action in other instances involving "immoral conduct or conduct that has brought the Township police department into disrepute." (Plaintiff's Response Br. at 1.)

ment would be concerned that individuals hired to be guardians of the law should themselves have a history of compliance with the law.").

But, Defendants have identified yet another, even stronger justification for their decision. Plaintiff's partner in his relationship was not a third party or mere stranger with no connection to Defendant's police department; rather, he choice to enter into a relationship with the wife of his superior officer on the force, Sergeant Yono. The courts have frequently recognized the critical importance of cohesiveness among fellow officers on a police force. *See, e.g., Kelley*, 425 U.S. at 248, 96 S.Ct. at 1446 (finding that "a desire for … esprit de corps" was "a sufficiently rational justification" for a hair-length regulation); *Egger v. Phillips*, 710 F.2d 292, 319 (7th Cir.1983) (noting "the need for teamwork among [FBI] agents and the high stakes that are involved in law enforcement," and observing that "the caselaw appears unanimous in recognizing the salience of these interests in the context of state and local law enforcement agencies"); *Shawgo v. Spradlin*, 701 F.2d 470, 483 (5th Cir.1983) (upholding a police department's anti-cohabitation policy, and finding "a rational connection between the exigencies of Department discipline and forbidding members of a quasi-military unit, especially those different in rank, to share an apartment or to cohabit"); *Kukla*, 647 F.Supp. at 809 (noting that "at any time officers may be called upon to work together in an intensely cooperative way"). This is all the more true where, as here, the Township police force is relatively small, numbering roughly thirty officers in all, and where Plaintiff and Sergeant Yono often worked together. *See Kukla*, 647 F.Supp. at 810 (finding that "the size of the police force" is a relevant consideration, and stating that "[g]iven human nature, a belief that an intra-departmental relationship

would negatively affect the department is more reasonable on a small force than a large one"). Under these circumstances, where "close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151–52, 103 S.Ct. at 1692.

In his letter announcing his decision to terminate Plaintiff, Defendant Perkins relied heavily on this need for cohesiveness among members of the Township police force. This letter notes that "[e]ach officer's competence affects the overall effectiveness of this department," and states that "[i]t is truly unfortunate that [Plaintiff] did not think about how [his] inappropriate behavior could undermine not only the public trust, but more importantly the trust fellow officers had in [him]." (Plaintiff's Response Br., Ex. 12, at 2.) Defendant Perkins further states that Plaintiff's "display of unprofessional conduct to members of this department and Sgt. Yono has caused a harm so great that the restoration of the confidence your fellow officers had in you is an impossibility." (*Id.*) He observes, finally, that this is especially so "in a small department such as this where there is a great reliance on each other." (*Id.*) Thus, Defendant Perkins concluded that Plaintiff was guilty of unprofessional conduct, defined in the department rules as "any action or inaction which discredits the officers and/or the department or which impairs the operation and efficiency of the department or the officer." (*Id.* (quoting Rule of Conduct 7120.10.3).) [10] Under the *Pickering* balancing test, there is no doubt that this conclusion was neither arbitrary nor irrational.

While not denying that his conduct could cause strain in his relationship with fellow officers, Plaintiff nevertheless contends that there is insufficient evidence in this case of any actual negative impact on de-

---

**10.** The arbitrator who heard Plaintiff's grievance reached a similar conclusion in upholding Plaintiff's discharge, stating that "[t]he operation and efficiency of the Department were adversely affected, and would be more gravely affected were Officer Mercure reinstated." (Defendant's Br., Ex. C, at 8.)

partmental operations, and that "the Township police department did not come to a screeching halt." (Plaintiff's Response Br. at 9.) The law, however, does not require Defendants to wait and see whether the department would "come to a screeching halt" before taking action. Rather, as the Sixth Circuit explained in upholding a anti-nepotism policy imposed on public school teachers, the defendant school system was entitled to implement this policy without waiting for the "recited harms [to] manifest themselves in an individual case," and the policy itself could be deemed "rational even if [the school] never witnessed any of the parade of horribles it has asserted." *Montgomery v. Carr*, 101 F.3d 1117, 1132 (6th Cir.1996). Similarly, the Supreme Court has reasoned that "we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152, 103 S.Ct. at 1692; *see also Waters v. Churchill*, 511 U.S. 661, 673, 114 S.Ct. 1878, 1887, 128 L.Ed.2d 686 (1994) (in a case involving government employee speech, noting that "we have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern, and even though when the government is acting as sovereign our review of legislative predictions of harm is considerably less deferential"); *Shahar, supra*, 114 F.3d at 1108 (finding that "a particularized showing of interference with the provision of public services is not required"). It is all the more unnecessary for the government employer to "wait and see" in this case, where a breakdown in working relationships could seriously undermine the effectiveness of the Township police force, with potentially devastating consequences to Township citizens.

In sum, Plaintiff has failed to identify any way in which Defendants' decision to discharge him was arbitrary, irrational, or unreasonable. The law prohibits this Court from inquiring any further into the merits of this decision, or from second-guessing the "fairness" of it. "The Constitution is not an employment manual," and "federal courts cannot undertake in the name of the Constitution to regulate minutely every restriction that public employers place on their employees." *Swank, supra*, 898 F.2d at 1252. Defendants have identified several rational reasons for their decision, and this is all that the Constitution requires.

**D. Defendants Are Entitled to Qualified Immunity in Their Investigation of Plaintiff's Conduct.**

In addition to challenging Defendants' decision to terminate his employment, Plaintiff also challenges the means by which Defendants determined that he was engaged in an affair with the wife of Sergeant Yono. Specifically, Plaintiff alleges that Defendants' investigation into his off-duty conduct, like their decision to discharge him, violated his constitutional right to privacy. However, even assuming this investigation infringed upon Plaintiff's privacy rights, the Court concludes that Defendants are shielded from liability under the defense of qualified immunity.

As noted earlier, the constitutional right of privacy exists in two forms, protecting against unwarranted disclosure of personal matters, as well as against governmental interference in making certain types of fundamental personal decisions. *Whalen, supra*, 429 U.S. at 599–600, 97 S.Ct. at 876. In challenging Defendants' investigation, Plaintiff appeals to the first of these two forms of privacy, often referred to as the "right to be let alone." The source of this right, and the corresponding restriction on the Township's ability as a government employer to investigate its employees, is the Fourth Amendment protection against unreasonable searches and seizures. *See O'Connor v. Ortega*, 480 U.S. 709, 715, 107 S.Ct. 1492, 1496, 94 L.Ed.2d 714 (1987) (analyzing a workplace search of a public

employee's office, desk, and file cabinets under Fourth Amendment principles).

As in any Fourth Amendment inquiry, it is necessary as an initial matter to determine whether Plaintiff had "an expectation of privacy that society is prepared to consider reasonable." *O'Connor*, 480 U.S. at 715, 107 S.Ct. at 1496 (internal quotations and citation omitted). Plaintiff's right-to-privacy claim quickly founders on this requirement. As Plaintiff himself states in his brief, "the only investigation that was conducted was the taking of a photograph of Plaintiff's private vehicle at the residence of [Sergeant] Yono's estranged wife." (Plaintiff's Response Br. at 9.) Defendant Brooks, who conducted this investigation in the early morning hours of July 14, 1998, along with the other officers on the night shift, testified that he and a fellow officer, Officer Dolan, took pictures of Plaintiff's car as it was parked in the driveway of the mobile home at which Sergeant Yono's estranged wife was residing, and that he simply drove down the street in order to take these pictures. (Defendant's Br., Ex. A, Arbitration Hearing at 35–36.) Later that same day, at meetings with his fellow officers and then with Defendant Perkins, Plaintiff admitted to his relationship with Sergeant Yono's wife, and declined requests that he end this relationship. (*Id.* at 45, 173–74, 176.)

Thus, the record indicates that when Defendant Brooks and Officer Dolan took pictures of Plaintiff's vehicle, the car was openly and plainly visible from the street. Plaintiff does not allege that Defendants undertook any more invasive action in their investigation; rather, when confronted with these pictures, he admitted his relationship with Sergeant Yono's wife. Under these circumstances, there can be no "reasonable expectation of privacy" in a vehicle parked in a driveway and visible from a public street.

This leaves Plaintiff with only the claim that it was *per se* unreasonable for Defendants to undertake any sort of investigation of Plaintiff's conduct, presumably because it involved "private" off-duty activity. Yet, where the Court has already found that this activity is not encompassed within any constitutional right to privacy, and that Defendants committed no constitutional infraction by discharging Plaintiff for this conduct, it cannot be said that Defendants violated the Constitution merely by investigating, through means that did not transgress any reasonable expectation of privacy, whether Plaintiff was in fact engaged in this conduct. Rather, for the same reason that Defendants could have rationally concluded that Plaintiff's behavior was grounds for discharging him, they likewise could have reasonably concluded that Plaintiff's "private" conduct was in fact a matter of departmental concern, and that they were entitled, therefore, to investigate whether the rumors of Plaintiff's relationship with Ms. Yono were true.

Further, even if the constitutionality of the investigation could be deemed questionable, Defendants still could not be held liable under 42 U.S.C. § 1983 unless their actions violated a "clearly established" right. The Sixth Circuit's recent decision in *Hughes, supra,* is directly on point, and shows that there is no such clearly established right at issue here. In *Hughes,* the Court first outlined the law of qualified immunity as established by the Supreme Court:

> In *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court held that "governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Reiterating this standard, the Supreme Court stated in *Davis v. Scherer,* 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984), "[w]hether an official may prevail in his qualified immunity defense depends upon the 'objective reasonable-

ness of [his] conduct as measured by reference to clearly established law.'" 93 F.3d at 241. The Sixth Circuit then noted that clearly established rights are determined by reference "first to the decisions of the Supreme Court, then to decisions of this Court and other courts within our Circuit, and finally to the decisions of other Circuits," but that, "as a general rule, a district court decision by itself cannot ordinarily clearly establish a law even of its own circuit, much less that of other circuits." 93 F.3d at 241.

The Court then turned to the case before it, in which the plaintiffs, a police officer and his wife, alleged that the defendants, a city and various police department officials, had violated their constitutional rights of free association and privacy by inquiring about their personal sexual activities while investigating allegations that the plaintiff officer had sexually harassed co-workers, dated a gang member's mother, and bragged that he maintained an open marriage and a "swinging" lifestyle. The Court found that Supreme Court precedents supplied no relevant "clearly established" right that had been abridged by the defendants, as "the Supreme Court has not definitively answered the difficult question whether and to what extent the Constitution prohibits a state (or state actor) from regulating the private consensual sexual behavior of adults." 93 F.3d at 241–42.

The Sixth Circuit then found that *Briggs, supra,* was the only decision within this Circuit to deal with a similar issue of "sexual privacy," but that even this case "did not clearly establish that a violation of the right to privacy or free association would occur if a police department conducted an investigation into the marital sexual relations of a police officer accused of sexual harassment." 93 F.3d at 242. Rather, because *Briggs* addressed a dismissal of a police officer "solely because of his living status, without any reference as to how that status could have affected his performance as an officer," the Court held that this prior ruling did not carry over to the case before it, where the defendants' inquiries "were justified because they pertained to the claims that [the plaintiff officer] harassed [female co-workers] and had extensive involvement with [a gang member and his mother]." 93 F.3d at 242. Thus, although the Court "d[id] not condone" the defendants' questions about the plaintiffs' marital relationship, it nevertheless found that the defendants should have been granted qualified immunity, "in the absence of more fact-specific authority defining how an investigation into private sexual matters invades the realm of privacy and free association." 93 F.3d at 242–43.

Similarly, in this case, while the Court does not condone Defendant Brooks' decision to investigate the rumors of Plaintiff's relationship with Ms. Yono, much less his decision as the most senior officer on the night shift to invite every squad car on this shift to come and view Plaintiff's vehicle in Ms. Yono's driveway, the Court finds that Sergeant Brooks' actions violated no clearly established right of "sexual privacy" or free association.[11] First, unlike in *Hughes,* the relationship under investigation here was not between a married couple, but between an officer and his superior officer's wife. Next, as in *Hughes,* and unlike in *Briggs,* the investigation here was not wholly unrelated to Plaintiff's conduct as a police officer. Rather, as discussed earli-

---

11. Plaintiff apparently does not charge the other Defendants with liability for this investigation (apart from the municipal liability claim, discussed below), as he states in his brief that Sergeant Brooks' investigation "was not an official police investigation," but was evidently undertaken by Defendant Brooks at his own initiative. (Plaintiff's Response Br. at 14.)

It should be noted that Brooks' investigation, if truly "unofficial," would arguably not be under "color of state law," and thus would not give rise to liability under 42 U.S.C. § 1983. *See Cronin, supra,* 895 F.Supp. at 391. However, the Court will assume that this element of a § 1983 claim is satisfied, particularly where Brooks conducted his investigation during his shift and in a Township patrol car.

er, Plaintiff's relationship with Ms. Yono was relevant to his performance as an officer, because it threatened the cohesiveness of the members of the Township police force and perhaps violated Michigan's adultery statute. Moreover, Sergeant Brooks' investigation did not excessively intrude into Plaintiff's private affairs, but uncovered only the publicly observable fact that Plaintiff had parked his car at Ms. Yono's home.

Accordingly, as was true in *Hughes,* no "clearly established" law, in this Circuit or elsewhere, would have informed Defendant Brooks that his actions implicated Plaintiff's constitutional rights of privacy or free association. The only case that could be viewed as establishing a right of "sexual privacy," *Briggs,* is distinguishable on the ground that it involved conduct found to be purely private. Having already concluded that Defendants acted on a legitimate concern that Plaintiff's conduct had implications to the operation of the Township police force, the Court finds that Defendant Brooks violated no clearly established rights in his investigation of Plaintiff's relationship with Ms. Yono, and that Brooks is entitled to qualified immunity from the constitutional claims against him.[12]

### E. Plaintiff Has Failed to Identify an Unconstitutional Custom or Policy of the Defendant Township.

 In his federal constitutional claim against the Defendant Township, Plaintiff cites *Monell v. Department of Social Servs.,* 436 U.S. 658, 691–94, 98 S.Ct. 2018, 2036–38, 56 L.Ed.2d 611 (1978), and its progeny for the proposition that a local government may be held liable for its unconstitutional customs or policies. Plaintiff further notes that, under *City of St. Louis v. Praprotnik,* 485 U.S. 112, 126–27, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988) (plurality opinion), and *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986), liability may be imposed upon a local governmental entity for a single decision by a government policymaker, or by a subordinate official who lacks policymaking authority but whose action is subsequently ratified by someone possessing policymaking authority. *See also Feliciano v. City of Cleveland,* 988 F.2d 649, 654–55 (6th Cir.1993). Plaintiff then points to Defendant Perkins' decision to discharge him, a decision subsequently upheld by Defendant Foster, as an allegedly unconstitutional policy or practice giving rise to municipal liability in this case.[13]

Plainly, to the extent Plaintiff argues that the Township maintained an unconstitutional policy or practice of discharging employees based on their exercise of their rights of sexual privacy and free association, this claim cannot succeed. Rather, given the Court's holding that no such rights were abridged in this case, there is

---

12. It is not clear whether Plaintiff is asserting a separate constitutional claim based on Defendant Brooks' alleged posting of the picture of Plaintiff's car on the bulletin board of the police roll call room. This claim, if asserted, would suffer from the same defect described above: namely, that Plaintiff had no reasonable expectation of privacy in his vehicle parked in Ms. Yono's driveway and visible from the public street. Moreover, for the reasons set forth above, Defendant Brooks also would be protected by qualified immunity in his limited dissemination of the picture to other members of the Township police force. *See Cronin, supra,* 895 F.Supp. at 391 (finding that the defendant police officers were entitled to qualified immunity in their "limited dissemination" of a sexually explicit handwritten letter found in the plaintiff police chief's desk, given the "sharply divided caselaw on the authority of a municipality to inquire into a police officer's private sexual conduct and its impact on fitness for duty").

13. For purposes of this motion, the Court will assume that these Defendants possessed policymaking authority for the Township, or that their decisions were ratified by someone with such authority. This appears to be a safe assumption, where Defendant Perkins is the Township's Director of Public Safety, the top position in the Township police force, and Defendant Foster is a Township supervisor who ratified Defendant Perkins' decision to discharge Plaintiff.

no basis for charging any Defendant, individual or municipal, with a constitutional violation of this sort. In any event, Plaintiff does not contend that the Township adopted such a policy or practice. To the contrary, Plaintiff argues, in essence, that the Township lacked such a uniform policy or practice, and instead elected to discharge him while failing to take any disciplinary action against other employees who allegedly engaged in similar conduct. According to Plaintiff, this municipal practice of "arbitrary and selective" discipline gives rise to Township liability under 42 U.S.C. § 1983.

In *Wright v. MetroHealth Medical Center*, 58 F.3d 1130, 1137 n. 7 (6th Cir.1995), the Sixth Circuit considered a claim of selective enforcement of a government employer's anti-nepotism policy. After first upholding this policy against a challenge that it violated the plaintiff employees' fundamental right to marry, the Court next explained that "[s]elective enforcement of a facially constitutional regulation does not, by itself, violate equal protection." 58 F.3d at 1137 n. 7.[14] Rather, a claim of selective enforcement requires a showing that "the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure" the plaintiff. 58 F.3d at 1137 n. 7 (internal quotations and citation omitted). Because there was no allegation in *Wright* of "invidious discrimination because of an impermissible consideration," and also no allegation that the employer had acted in bad faith, the Sixth Circuit affirmed the lower court's award of summary judgment to the employer on this selective enforcement claim. 58 F.3d at 1137 n. 7.

Similarly, in this case, the Township is entitled to summary judgment on Plaintiff's claim of arbitrary and selective discipline. First, Plaintiff has failed to identify any protected class to which he belongs, such that the Township's actions would be subject to heightened scrutiny. Next, the Court already has concluded that the decision to discharge Plaintiff did not inappropriately punish or inhibit his exercise of constitutional rights.

Thus, to succeed under this theory of selective discipline, Plaintiff must allege and show that the Township, through Defendants Perkins and Foster, acted with a malicious and bad faith intent to injure him. Plaintiff's complaint includes no such allegations, and there is no suggestion in the record that Defendants Perkins and Foster harbored such ill will toward him.[15] Plaintiff, however, attempts to sustain this claim by suggesting that the Township acted arbitrarily, and by unveiling a laundry list of alleged misdeeds by other members of the Township police force that did not result in dismissals.

Apart from the many questions as to the admissibility of Plaintiff's "evidence" of this alleged wrongdoing, much of which is in the form of inadmissible hearsay that may not be considered in deciding a motion for summary judgment, *see U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir.1997), Plaintiff's allegations are deficient in one important respect. Specifically, not one of the alleged instances of wrongdoing by Township police officers, even if true, is sufficiently similar to the conduct for which Plaintiff was discharged to give rise to an inference of selective or arbitrary discipline. In particular, none involved a rela-

---

**14.** Although Plaintiff has not identified the constitutional provision upon which his claim of selective discipline rests, the Court is unaware of any provision apart from the Fourteenth Amendment's Equal Protection Clause that might bear upon this claim.

**15.** Rather, Plaintiff accuses Defendant Perkins only of "hypocrisy," presumably based on his decision to discharge Plaintiff while allegedly participating in an adulterous relationship himself. Even if this were true (and relevant), it would not suggest why Defendant Perkins might have singled out Plaintiff for discipline.

tionship between a police officer and the spouse of another officer, with its resulting threat to the cohesiveness of the police force.[16] Thus, the incidents alleged by Plaintiff fail to lend any support to his claim of selective enforcement. Because this is the only basis for Plaintiff's claim of municipal liability, this claim must fail.

## F. To the Extent Plaintiff's Civil Conspiracy Claim Rests upon Federal Constitutional Violations, Defendants Are Entitled to Summary Judgment on This Claim.

Finally, Plaintiff alleges in his Complaint that Defendants conspired to violate his constitutional rights and wrongfully terminate him. To the extent this claim is based on alleged violations of the U.S. Constitution, it presumably rests upon either 42 U.S.C. § 1983 or 42 U.S.C. § 1985(3), which prohibits conspiracies "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."

As an initial matter, under the "intracorporate conspiracy" doctrine, Defendants Perkins, Foster, and Brooks cannot be found to have conspired with the entity for which they all acted as agents, the Township, unless Plaintiff can show that they acted outside the scope of their employment. *See Jackson v. City of Columbus,* 194 F.3d 737, 753 (6th Cir.1999); *Johnson v. Hills & Dales Gen. Hosp.,* 40 F.3d 837, 839–41 (6th Cir.1994), *cert. denied,* 514 U.S. 1066, 115 S.Ct. 1698, 131 L.Ed.2d 560 (1995). There is neither allegation nor

evidence of acts outside the scope of employment here. In any event, having previously found that Plaintiff suffered no deprivation of his constitutional rights, the Court concludes that Plaintiff has not shown any conspiracy to bring about such a deprivation of rights. Thus, Defendants are entitled to summary judgment on this claim, to the extent it rests upon alleged violations of federal constitutional rights.[17]

## IV. *CONCLUSION*

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment is GRANTED. IT IS FURTHER ORDERED that Plaintiff's remaining state-law claims are REMANDED to Wayne County Circuit Court.

## *ORDER DISMISSING FEDERAL CLAIMS AND REMANDING REMAINING STATE–LAW CLAIMS*

The Court having this day entered an Opinion and Order (i) granting Defendants' Motion for Summary Judgment with respect to the federal claims asserted in Plaintiff's Complaint and not previously dismissed by stipulation of the parties, and (ii) declining to retain jurisdiction over the remaining state-law claims asserted in the Complaint,

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDICATED, AND DECREED that Plaintiff's remaining federal claims set forth in Counts I, III, and VIII of his Complaint be, and hereby are, dismissed in their entirety with prejudice. IT IS FURTHER ORDERED that Plaintiff's remaining state-law claims be RE-

16. The closest to an analogous incident cited by Plaintiff is his reference to a sexual harassment claim lodged against Defendant Brooks by a police dispatcher. However, while Plaintiff claims that Defendant Brooks was not disciplined for this conduct, Defendants have submitted an affidavit of Defendant Perkins stating that "Sgt. Brooks was disciplined within the parameters of the Collective Bargaining Agreement." (Defendants' Reply Br., Ex. G, Perkins Affidavit at ¶ 3.)

17. Having resolved all of Plaintiff's federal claims, the Court declines to retain jurisdiction over Plaintiff's remaining state-law claims. *See* 28 U.S.C. § 1367(c)(3). Accordingly, these claims—including those portions of Counts I and III arising under the Michigan Constitution, any portion of Count VIII not involving alleged federal constitutional violations, and Counts VI and VII—will be remanded to state court.

834

MANDED to Wayne County Circuit Court for further proceedings.